[Nos. F067831, F068618. Fifth Dist. May 1, 2015.]

JAIME SALAZAR et al., Plaintiffs, Cross-defendants and Appellants, v. JACK THOMAS et al., Defendants, Cross-complainants and Respondents.

470

**COUNSEL**

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, David J. Cooper; Wendel, Rosen, Black & Dean, Charles A. Hansen, Kevin R. Brodehl; Law Office of Thomas C. Fallgatter and Thomas C. Fallgatter for Plaintiffs, Cross-defendants and Appellants.

Anderson, McPharlin & Conners, Michael S. Robinson and D. Damon Willens for Defendants, Cross-complainants and Respondents.

**OPINION**

**FRANSON, J.**—This appeal involves the application of the statute of limitations to a quiet title action that attempts to have a deed of trust declared

void as a forgery. The plaintiffs are record owners in possession of the property. One of their sons was most likely involved in the forging and recording of the challenged deed of trust and related promissory note.

The defendant beneficiaries under the deed of trust moved for summary judgment, asserting the affirmative defenses of the statute of limitations, waiver of the forgery claim, unclean hands, ratification, and laches. The trial court granted summary judgment on the three-year limitations period in Code of Civil Procedure section 338, subdivision (d),[1] but did not address the other affirmative defenses. The court concluded that the notices of default sent by lender to the plaintiffs in 2005 triggered the statute of limitations and the limitations period had expired before the quiet title action was filed in January 2012.

On appeal, plaintiffs rely on their status as owners of record in possession of the property and "the rule that the statute of limitations does not bar an action to quiet title by an owner in undisturbed possession of land . . . ." (*Mayer v. L&B Real Estate* (2008) 43 Cal.4th 1231, 1238 [78 Cal.Rptr.3d 62, 185 P.3d 43] (*Mayer*).) Plaintiffs argue their *possession* was not disturbed by the delivery of notices of default under a forged, and therefore void, deed of trust. On this issue of first impression, we conclude that the notices of default under a void deed of trust provided notice of a cloud on plaintiffs' title, but did not dispute or disturb plaintiffs' possession of the property. Consequently, the statute of limitations does not bar their quiet title action.

As to the beneficiaries' other affirmative defenses of waiver, unclean hands, ratification, and laches, their separate statements do not set forth all of the facts material to those defenses. For example, the fact of prejudice or detriment is material to the defenses of unclean hands and laches and the separate statements did not identify how the beneficiaries were prejudiced by not being informed about the forgeries until 2006.

We therefore reverse the judgment and the order awarding attorney fees.

## FACTS

Plaintiff Jaime Salazar was born in Mexico in 1945. He attended school through the second grade, speaks little English, reads hardly any English, and cannot write English. Plaintiff Alisia Salazar was born in California in 1949 and attended school through the second grade. She understands very little English and does not speak, read or write English. Plaintiffs were married in 1964. Since about 1990, plaintiffs have made a living by operating a food truck.

---

[1] All further statutory references are to the Code of Civil Procedure, unless stated otherwise.

In 1992, plaintiffs purchased the commercial real property that is the subject of this action, located on East Brundage Lane in Bakersfield (Brundage Property). Plaintiffs' declarations state that since purchasing the Brundage Property they "have had a store there, a restaurant and other similar businesses." For most of the time, all of the businesses occupying the Brundage Property were run by their children, who did not pay rent. Plaintiffs also had other tenants who paid them rent.

On January 7, 2005, a deed of trust and absolute assignment of rents, signed on December 17, 2004, was recorded with the Kern County Recorder's Office as document No. 0205004541 (deed of trust). The deed of trust listed two parcels of real estate as collateral—the Brundage Property and another parcel located on California Avenue in Bakersfield (California Avenue Property). The debt secured by the deed of trust was described as a promissory note dated December 13, 2004, in the principal amount of $350,000.[2] The proceeds of the promissory note were for the purchase of the California Avenue Property.

The deed of trust stated defendant Hope Trust Deed Company, Inc., a California corporation doing business as HOPE 4 LOANS (Hope, Inc.), was the trustee and listed as beneficiaries defendants Ann Howard (15 percent interest), J.D. Heib (11 percent interest), Mary Burleigh (6 percent interest), and Hope, Inc. (68 percent interest). Hope, Inc., subsequently assigned portions of its interest in the loan to other individuals and trusts. These individuals and trustees of the trust, along with the loan servicer, constitute the remaining defendants in this lawsuit.[3]

The motions for summary judgment that are the subject of this appeal were filed by two groups of defendants. Jeffrey Dwayne "J.D." Heib, Walter Okon and Hope, Inc., constituted the "Hope Defendants." Jack Thomas, Maria Thomas, Bret M. Powell, Carlos E. Zozula, Maria A. Zozula, Beverly Barnhart, Ann Howard, Mary Burleigh and related trusts constituted the "Thomas Defendants."[4]

Both the deed of trust and the note purport to have been made by plaintiffs. However, plaintiffs alleged that the signatures on the note and deed of trust

---

[2] The note's unpaid principal balance accrued interest at the rate of 11 percent per annum. The note was to be paid in 180 monthly installments of $3,978.09 and provided for a late charge equal to 10 percent of the delinquent payment.

[3] PLM Lender Services, Inc. (PLM), acted as the loan servicer and was a substitute trustee under the deed of trust. PLM filed a declaration of nonmonetary status pursuant to Civil Code section 2924*l* and, as a result, is neutral in this litigation.

[4] It appears from the record that Jack Thomas and Jeffrey Dwayne Heib were officers of Hope, Inc., around the time of the loan. They signed an assignment of deed of trust on behalf of Hope, Inc., in the capacity of CEO and CFO, respectively.

were forged and were not placed on the deed of trust at their direction. Mr. Salazar believes that their son, Jaime Salazar, Jr. (Junior), forged their names on the documents.

On March 30, 2005, a notice of default and election to sell under deed of trust was recorded. It stated that past due payments and expenses totaling $10,851.98 were due as of March 29, 2005, and payment of this amount was necessary to bring the $350,000 promissory note into good standing. The notices of default were mailed to plaintiffs.

Because plaintiffs did not speak or read English, their youngest daughter, Marina Salazar (Marina), would go through their mail and identify the mail that was in English. Marina would open and look at that mail.

In 2005, when Marina opened mail containing copies of the notices of default, she called her brother Zeke Salazar (Zeke) and asked him if he knew anything about a mortgage or default on the Brundage Property. Zeke told her he did not know anything and suggested she call Junior. Junior told Marina that it was his business and he would take care of it. Marina's declaration states that, acting on the advice of Zeke, she did not show or tell plaintiffs about the notices of default at that time.

After additional notices of default were received, Zeke told Marina to talk with their father. Marina's declaration states she believes this occurred in late 2005 and, a short time later, her father asked her to contact the people sending the notices. Accordingly, Marina started calling the loan servicer, PLM, in late 2005. From her first call to PLM until sometime in 2011, Marina spoke regularly with different people at PLM about the mortgage.

Marina's declaration states that sometime in 2006 or 2007, she told someone at PLM that her parents had not signed the mortgage on the Brundage Property and that someone had forged their signatures. A short time later, perhaps the same day, Marina received a phone call from a man who identified himself as Heib. Marina repeated to him that her parents had not signed any mortgage on the Brundage Property and that their signatures must have been forged. In response, Heib said something like, "Well that is interesting," thanked her for talking to him, and ended the telephone conversation.

When Junior disappeared in 2009, Mr. Salazar began to make the payments on the loan. He would bring Marina money and she would deposit it into her bank account, purchase a cashier's check and send the check to PLM. Marina's declaration states these payments by her father began in mid-2009 and, after a few payments, PLM sent another notice of default.

Marina's declaration states that she and Heib had discussions about the latest default and they "agreed to an arrangement where my father would pay some amount immediately and would pay the regular monthly payment every month, and in addition, would pay an extra amount later." Shortly after that discussion, PLM sent a forbearance agreement to Marina. She signed her parents' names on the forbearance agreement and sent it to PLM in October 2009.

The forbearance agreement identified plaintiffs as the "borrower" and included provisions (1) setting forth a payment schedule; (2) stating the borrower released all claims against defendants; and (3) representing that the borrower had no claims, actions or offsets relating to the loan documents, the secured obligation or the deed of trust. The forbearance agreement also stated that, prior to signing the agreement, the borrower had been advised to take it to an independent attorney and had been given an opportunity to do so.

Subsequently, Mr. Salazar made payments in accordance with the schedule of payments set forth in the forbearance agreement. Later, Marina signed plaintiffs' names to two extensions of the forbearance agreement.

The forbearance agreement and extensions were prepared by PLM at the direction of Hope, Inc. Hope, Inc., asserts that it rescinded the defaults and reinstated the loan based on its receipt of the signed forbearance agreement and the payments made pursuant to that agreement.

Payments continued to be made on the loan as of the date of defendants' motion for summary judgment.

## PROCEEDINGS

On January 9, 2012, plaintiffs filed a verified complaint. The operative pleading in this case is their second amended complaint (SAC), which alleges causes of action for (1) quiet title, (2) declaratory relief, (3) relief on the ground of mistake, (4) cancellation of deed of trust, and (5) injunctive relief. The SAC challenges the validity of the deed of trust, alleging plaintiffs' signatures on the note and deed of trust were forged and those signatures were not placed on the deed of trust at their direction. Plaintiffs also alleged the deed of trust was a cloud on their title to the Brundage Property.

The Hope Defendants and the Thomas Defendants filed answers and then cross-complained against plaintiffs and Junior. The third affirmative defense in both answers asserted that "every purported cause of action in the Second

Amended Complaint is barred by the applicable statute of limitations, including, but not limited to, Code of Civil Procedure [sections] 318, 319, 320, 321, 325 and 338."[5]

In April 2013, the Hope Defendants and the Thomas Defendants filed motions for summary judgment. The motions were based on five affirmative defenses: (1) the three-year statute of limitations in subdivision (d) of section 338, (2) waiver, (3) unclean hands, (4) ratification, and (5) laches.

Defendants' separate statements repeated the same 70 paragraphs of material facts for each of the affirmative defenses.[6]

Plaintiffs filed oppositions to both motions accompanied by supporting evidence and a separate document containing 19 written objections to the evidence presented by defendants. Defendants' reply papers included 24 objections to the evidence submitted by plaintiffs.

In June 2013, at the hearing on the motions, the trial court announced its rulings on the objections and then heard arguments from counsel. The court also granted defendants' request for judicial notice of several recorded documents and documents filed with the court.

In July 2013, the trial court filed orders granting the motions for summary judgment. Judgments in favor of defendants were later entered.

Plaintiffs appealed the judgments.

*Attorney Fees Award and Appeal*

After the judgments were entered, defendants filed motions for attorney fees as authorized by contract and by Civil Code section 1717. Plaintiffs opposed the motions.

---

[5] Plaintiffs contend that section 458 requires the pleading of the subdivision of the statute, if so divided, and that defendants' pleading of the three-year statute of limitations contained in section 338 is insufficient because subdivision (d) was not mentioned in the answer. (See *Brown v. World Church* (1969) 272 Cal.App.2d 684, 691 [77 Cal.Rptr. 669] [defendants failed to specify under which subdivision of § 337 they allegedly came].) Because this opinion is based on other grounds, we do not reach the question of whether defendants sufficiently pleaded their statute of limitations defense.

[6] This cut-and-paste approach to the preparation of a separate statement has its dangers for a moving party asserting multiple defenses " 'because the separate statement effectively *concedes* the materiality of whatever facts are included. Thus, if a triable issue is raised as to any of the facts in [such a] separate statement, the motion must be denied!' [Citation.]" (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 252 [100 Cal.Rptr.3d 296] [criticizing the inclusion in the separate statement of nonmaterial facts for background, foundational, information or other purposes].) Also, as seen below, relying on the same assertions of fact for all of the defenses risks the exclusion of a fact material only to a particular defense.

In October 2013, the trial court awarded attorney fees to the Hope Defendants and the Thomas Defendants in the amounts of $110,753.32 and $156,685.00, respectively. Plaintiffs appealed the awards of attorney fees.

In February 2014, pursuant to the stipulation of the parties, this court consolidated the appeal from the judgment with the appeal of the award of attorney fees.

## DISCUSSION

### I. *Motions For Summary Judgment**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *Statute of Limitations For Quiet Title Actions*

The first issue defendants presented in their motion for summary judgment was whether all plaintiffs' causes of action were barred by the three-year statute of limitations in section 338, subdivision (d).

#### A. *General Principles*

##### 1. *Choosing a Limitations Period*

■ The Legislature has not established a specific statute of limitations for actions to quiet title. (*Muktarian v. Barmby* (1965) 63 Cal.2d 558, 560 [47 Cal.Rptr. 483, 407 P.2d 659] (*Muktarian*).) Therefore, courts refer to the underlying theory of relief to determine the applicable period of limitations. (*Ibid.*; see 53 Cal.Jur.3d (2012) Quieting Title, § 34, pp. 412–413.) An inquiry into the underlying theory requires the court to identify the nature (i.e., the "gravamen") of the cause of action. (*Hensler v. City of Gendale* (1994) 8 Cal.4th 1, 22 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

Generally, the most likely time limits for a quiet title action are the five-year limitations period for adverse possession,[7] the four-year limitations

---

*See footnote, *ante*, page 467.

[7] Claims involving adverse possession are subject to the five-year limitations period in sections 318, 319, 320 and 321.

period for the cancellation of an instrument,[8] or the three-year limitations period for claims based on fraud and mistake.[9]

## 2. *When the Limitations Period Begins to Run*

■ Although the applicable limitations period is determined by looking at the gravamen of the quiet title cause of action, the general principles about when that limitations period commences[10] do not necessarily apply because quiet title actions have special rules for when the limitations period begins to run.

First, " 'as a general rule, the statute of limitations [for a quiet title action] does not run against one in possession of land.' " (*Tannhauser v. Adams* (1947) 31 Cal.2d 169, 175 [187 P.2d 716].) Part of the rationale for this special rule for quiet title actions is an unwillingness to convert a statute of limitations into a statute that works a forfeiture of property rights on the person holding the most obvious and important property right—namely, possession. (*Ibid.*)

Second, this rule for quiet title actions is not absolute. It is subject to a qualification that the California Supreme Court has described in different ways over the years. Recently, the court stated: "It has long been the law that whether a statute of limitations bars an action to quiet title may turn on whether the plaintiff is in *undisturbed* possession of the land." (*Mayer, supra,* 43 Cal.4th at p. 1237, italics added.) The term *undisturbed* possession reflects the reference in *Sears v. County of Calaveras* (1955) 45 Cal.2d 518 [289 P.2d 425] (*Sears*) to "an owner in exclusive and undisputed possession . . . ." (*Id.* at p. 521.)

■ In 1965, Chief Justice Traynor discussed the general rule that the statute of limitations for a quiet title action does not run against a party in possession of the land and identified at least part of the rationale for the limited qualification: "[N]o statute of limitations runs against a plaintiff seeking to quiet title while he is in possession of the property. [Citations.] In many instances one in possession would not know of dormant adverse claims

---

[8] Actions for cancellation of an instrument are subject to the four-year limitations period in the catchall provision of section 343. (*Moss v. Moss* (1942) 20 Cal.2d 640, 644–645 [128 P.2d 526].)

[9] Section 338, subdivision (d) provides that a three-year limitations period applies to action "for relief on the ground of fraud or mistake."

[10] The general principles include the " 'last element' " accrual rule, which provides that the statute of limitations ordinarily runs from the occurrence of the last element essential to the cause of action and that a cause of action "accrues." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 [151 Cal.Rptr.3d 827, 292 P.3d 871].) The "last element" rule of accrual is subject to a number of exceptions, including the discovery rule, the "continuing violation doctrine," and "the theory of continuous accrual." (*Id.* at p. 1192.)

of persons not in possession. [Citation.] Moreover, even if, as here, the party in possession knows of such a potential claimant, there is no reason to put him to the expense and inconvenience of litigation *until such a claim is pressed against him.* [Citation.]" (*Muktarian, supra,* 63 Cal.2d at p. 560, fn. omitted, italics added.)[11]

Thus, mere notice of an adverse claim is not enough to commence the owner's statute of limitations.

■ Earlier, in 1921, the Supreme Court addressed the statute of limitations in a quiet title action by stating: "An outstanding adverse claim, which amounts only to a cloud upon the title, is a continuing cause of action, and is not barred by lapse of time, until the hostile claim is asserted in some manner to jeopardize the superior title. So long as the adverse claim lies dormant and inactive the owner of the superior title may not be incommoded by it and has the privilege of allowing it to stand indefinitely. Each day's assertion of such adverse claim gives a renewed cause of action to quiet title until such action is brought." (*Secret Valley Land Co. v. Perry* (1921) 187 Cal. 420, 426–427 [202 P. 449] (*Secret Valley*).)

The variations in language appearing in these Supreme Court decisions do not refer to different legal standards. Instead, they describe the same standard in different words. Therefore, the question presented in this case can be phrased as whether any of the notices of default sent to plaintiffs disturbed their possession of the Brundage Property. (*Mayer, supra,* 43 Cal.4th at p. 1237.) Alternatively, the question can be stated as (1) when were plaintiffs no longer owners "in exclusive and undisputed possession" of the land (*Sears, supra,* 45 Cal.2d at p. 521); (2) when was defendants' adverse "claim . . . pressed against" plaintiffs (*Muktarian, supra,* 63 Cal.2d at p. 561); or (3) when was defendants' hostile claim "asserted in some manner to jeopardize the superior title" held by plaintiffs (*Secret Valley, supra,* 187 Cal. at p. 426).

Defendants argue the statute of limitations began to run in 2005 because plaintiffs were not owners "in exclusive and undisputed possession." (*Sears, supra,* 45 Cal.2d at p. 521.) We adopt the "exclusive and undisputed" formulation of the legal standard and address whether plaintiffs' possession was both exclusive and undisputed.

---

[11] In this case, the expense of litigation was significant relative to the amount of the loan, as is evident from the order awarding attorney fees to the Hope Defendants and the Thomas Defendants in the amounts of $110,753.32 and $156,685.00, respectively. The total award equates to 76.4 percent of the amount of the original debt.

### B. *Exclusive Possession and Tenants*

Defendants argue plaintiffs were not in exclusive possession of the Brundage Property because plaintiffs had transferred possession of parts of the Brundage Property to rent-paying tenants or to businesses run by their children, who paid no rent. Defendants have cited no authority to support the position that an owner with tenants is no longer in exclusive possession of the property.

█ In contrast, a California legal encyclopedia has addressed how the commencement of the statute of limitations in a quiet title action is affected when the owner's property has been leased to a tenant: "[N]o statute of limitations runs against a plaintiff seeking to quiet title while he or she is in possession of the property, as where the plaintiff has been and is in possession through his or her tenant for a long period of time." (43 Cal.Jur.3d (2011) Limitations of Actions, § 108, p. 186, fn. omitted.) Similarly, in *Ankoanda v. Walker-Smith* (1996) 44 Cal.App.4th 610 [52 Cal.Rptr.2d 39], the court recognized the general principle "that a landlord remains seised and possessed of leased property through [his/her] tenant as against third parties and/or the tenant . . . ." (*Id.* at p. 618.) The court concluded this principle did not apply when the quiet title action was brought against an occupying tenant claiming a joint ownership interest pursuant to a recorded deed. (*Ibid.*)

In this case, plaintiffs and defendants are not joint occupants of the Brundage Property. Therefore, the facts of this case are distinguishable from those presented in *Ankoanda v. Walker-Smith, supra,* 44 Cal.App.4th 610. Accordingly, we conclude plaintiffs remained seised and possessed of the Brundage Property through their own occupancy or the occupancy of their tenants. In other words, the fact that tenants occupied some parts of the Brundage Property during the time in question is insufficient to establish plaintiffs lacked exclusive possession.

### C. *Disputed Possession—Notices of Default*

#### 1. *Contentions and Issues*

Defendants contend "possession became 'disputed' after [plaintiffs] received the first Notice of Default in March 2005" and, therefore, the notices of default triggered the statute of limitations.

Plaintiffs contend the notices of default were not valid because they were based on a void deed of trust and, alternatively, the notices of default were not a claim *to possession* and thus did not dispute plaintiffs' possession of the Brundage Property.

The parties have not cited, and we have not located, any case addressing whether a notice of default issued under a deed of trust (whether or not forged) is sufficient to "dispute" the owners' possession and thus commence of the statute of limitations for the owners' quiet title action. We therefore are presented with an issue of first impression.

### 2. Background

■ Generally, when a debt is secured by a deed of trust containing a power of sale, and a default has occurred, the creditor-beneficiary may seek recourse to the real property security through a judicial or a nonjudicial foreclosure. When the creditor-beneficiary chooses to pursue a nonjudicial foreclosure, the delivery of a notice of default is the first statutory step in that type of foreclosure. (See Civ. Code, § 2924b.) Subsequent steps in nonjudicial foreclosures include recording and delivering a notice of trustee's sale, holding the foreclosure sale, and issuing a trustee's deed upon sale to the successful bidder. (See Civ. Code, §§ 2924–2924h; *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 274–275 [146 Cal.Rptr. 208, 578 P.2d 925] (*Garfinkle*) [overview of statutory procedures for nonjudicial foreclosures].) After the trustee's deed has been recorded, the purchaser is entitled to bring an unlawful detainer action against the borrower-trustor or his or her successor to obtain possession of the property. (*Garfinkle, supra*, at p. 275; see § 1161a, subd. (b)(1) & (2).)[12]

A notice of default is a demand for payment of all amounts of the secured debt that are in default. It informs the property owner of the amount of the default, states the property may be sold without court action because the owner is behind in payments, and indicates that no sale day may be set until three months from the date the notice is recorded.

### 3. Analysis

Our analysis of disputed possession begins with the meaning of the phrase "undisputed possession." (*Sears, supra*, 45 Cal.2d at p. 521.) Because the Supreme Court's decisions do not indicate otherwise, we conclude the court used the phrase "undisputed possession" in its usual and ordinary sense.

■ "Dispute" means "to contend in argument: argue for or against something asserted or maintained" and "to call into question (as the validity

---

[12] We note the five steps from notice of default to an unlawful detainer action because each event in the sequence has the potential to be regarded as the one that first disputes or disturbs the owner's possession and thus triggers the statute of limitations in a quiet title action.

or the existence of something)." (Webster's 3d New Internat. Dict. (1993) p. 655.)

"Possession" is defined by Black's Law Dictionary (9th ed. 2009) page 1281 as "[t]he fact of having or holding property in one's power; the exercise of dominion over property" and "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object." It also defines "actual possession" as "[p]hysical occupancy or control over property." (*Id.* at p. 1282; see *Lawrence v. Fulton* (1862) 19 Cal. 683, 690 [the expressions " 'occupation' " and " 'subjection to the will and control' " signify actual possession].) Applying these definitions, "disputed possession" is the equivalent of having the validity of one's occupancy, dominion or control over the property called into question.

Here, delivery of the notices of default to plaintiffs would have informed them of an adverse claim or cloud on their title[13] to the Brundage Property, which is not the same as disputing possession.[14] (See *Muktarian, supra*, 63 Cal.2d at p. 560.) The notices of default simply stated that the borrowers were in default on their payment obligations and, if the default was not timely cured, their property may be sold. The notices of default did not call into question the validity of plaintiffs' control of the property by claiming plaintiffs' possession was improper or illegal. Also, the notices of default did not indirectly question plaintiffs' control of the property by asserting defendants were entitled to possess the Brundage Property. Rather, the notices of default presupposed that plaintiffs were the rightful owners of the Brundage Property and their ownership interest gave them an incentive to pay the amount of the indebtedness that was in default. Therefore, we conclude the notices of default did not dispute plaintiffs' possession of the Brundage Property.

Next, we compare this conclusion with the most recent decision of the California Supreme Court applying the concept of disputed possession.

In *Mayer, supra*, 43 Cal.4th 1231, the court concluded that (1) a defective notice of tax sale was insufficient to dispute or disturb the property owners'

---

[13] See *Secret Valley, supra*, 187 Cal. at page 426 (cloud on title contrasted with a hostile, actively asserted claim); Black's Law Dictionary, *supra*, at page 291 ("cloud on title" is a "defect or potential defect in the owner's title to a piece of land arising from some claim or encumbrance, such as a lien").

[14] For purposes of summary judgment, we assume without deciding that plaintiffs received and understood the notices of default opened by Marina in 2005. This assumption covers many of the specific facts that defendants' petition for rehearing contends are "material" to this appeal. Moreover, defendants' view of materiality is based on a legally erroneous view of the term "disturb" that focuses on the subjective impact of the notices of default on plaintiffs (i.e., whether it is emotionally troubling) and overlooks the need for a connection between the disturbance and the landowner's current right to *possession*.

possession and (2) a subsequent letter from the tax collector notifying the owners that the property *had been sold* at public auction was sufficient to disturb their possession. (*Id.* at p. 1240.) Even if we accept defendants' argument that a proper notice of tax sale would have been sufficient to dispute or disturb the owners' possession, it does not follow that a notice of default would have the same effect. A notice of tax sale has more in common with a notice of trustee's sale, a subsequent step in the nonjudicial foreclosure process, than to a notice of default. Both a notice of tax sale and a notice of trustee's sale inform the property owner of a scheduled sale of the property, an event that might provide the purchaser with a superior claim to the property. Therefore, our conclusion that the notices of default did not dispute plaintiffs' possession is compatible with the analysis adopted in *Mayer, supra*, 43 Cal.4th 1231.

■  Also, our conclusion is consistent with the Supreme Court's description of the nonjudicial foreclosure process that indicated a borrower-trustor's right to possession and use of the property "remains undisturbed" during the 110-day period that must elapse between the recording of the notice of default and the nonjudicial foreclosure sale. (*Garfinkle, supra*, 21 Cal.3d at p. 275, fn. 11.)[15]

■  In summary, we conclude the notices of default were not sufficient to dispute or disturb plaintiffs' possession of the Brundage Property.

III.–VI.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and the trial court is directed to (1) vacate its order granting the motions for summary judgment and its order granting the motions for attorney fees and (2) enter a new order denying those motions.

---

[15] We recognize that *Garfinkle* did not involve issues relating to the statute of limitations applicable to a quiet title action and, moreover, the court's use of the word "undisturbed" was not intended to provide insight into how that word would be used 20 years later in *Mayer*.

[*]See footnote, *ante*, page 467.

Plaintiffs shall recover their costs on appeal.

Hill, P. J., and Gomes, J., concurred.

A petition for a rehearing was denied May 28, 2015, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied August 12, 2015, S227043.